UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINDSEY SUTHERLAND,

      Plaintiff,

v.                                 Case No: 8:14-cv-2741-T-17TBM

BOEHRINGER-INGELHEIM
PHARMACEUTICALS, INC.,

      Defendant.

_____

## ORDER

This cause came before the Court pursuant to the *Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law* (Doc. No. 30) (the "**Motion for Summary Judgment**") filed by the Defendant, Boehringer-Ingelheim Pharmaceuticals, Inc. (the "**Defendant**") and the *Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment* (Doc. No. 34) (the "**Response**") filed by the Plaintiff, Lindsay Sutherland (the "**Plaintiff**"). Also before the Court are the motion to strike the Response (Doc. No. 35) (the "**Motion to Strike**") filed by the Defendant and the *Motion for Leave to File Plaintiff's Statement of Disputed Facts and to Amend Number of Pages of Memorandum of Law* (Doc. No. 36) (the "**Motion for Leave**") filed by the Plaintiff. For the reasons set forth below, the Motion for Summary Judgment is **GRANTED**, the Motion for Leave is **DENIED**, and the Motion to Strike is **DENIED AS MOOT.**

I.     **Background**

A.     **Procedural History**

The Plaintiff commenced this case on September 19, 2014 by filing a *Complaint* (Doc. No. 2) (the "**Complaint**") against the Defendant in Florida state court.  Through the Complaint, the Plaintiff alleges the following causes of action: Count I – employment discrimination based on gender under Chapter 760 of the Florida Statutes (the "**Florida Civil Rights Act**" or "**FCRA**") and hostile work environment;[1] Count II employment discrimination based on disability under the FCRA; Count III – retaliation under the FCRA; Count IV – negligent infliction of emotional distress; Count V – negligent hiring; and Count VI – negligent retention and supervision.  As a result of the alleged acts of wrongdoing by the Defendant, the Plaintiff seeks injunctive relief, compensatory damages, punitive damages, and an award of attorney's fees under the FCRA.

On October 30, 2014, the Defendant filed *Defendant's Notice of and Petition for Removal* (Doc. No. 1), removing the case to this Court based on federal question and diversity jurisdiction.  In addition, on October 30, the Defendant filed its answer and affirmative defenses to the Complaint. (Doc. No. 3).  On January 8, 2015, the Court entered a *Case Management and Scheduling Order* (Doc. No. 13) (the "**CMSO**"), which set a deadline of October 30, 2015 for the parties to complete discovery, and a deadline of December 1, 2015 for the parties to file motions for summary judgment.  The CMSO set forth specific procedures for the filing of summary judgment motions, including a requirement that any party opposing summary judgment must file a separate statement

---

[1] The employment discrimination and hostile work environment claims have not been broken into separate counts.  However, for purposes of ruling on the Motion for Summary Judgment, the Court will analyze the two claims separately.

of disputed facts, and that all material facts set forth by the moving party shall be deemed admitted unless controverted by a separate statement of disputed facts. (CMSO, at ¶ 6(c)).

On December 1, 2015, the Defendant filed the Motion for Summary Judgment, along with the *Defendant's Statement of Undisputed Facts* (Doc. No. 31) (the "**Statement**").  Attached to the Statement are transcripts of the Plaintiff's deposition testimony, as well as an affidavit submitted by an agent of the Defendant.  On December 15, 2015, the Plaintiff filed her Response.  The Response contains a "Statement of the Facts," but is not accompanied by a separate statement of disputed facts, as required by the CMSO.    Attached to the Response are various exhibits, including email correspondence between the Plaintiff and agents of the Defendant, employee records and performance reviews, medical and insurance records, EEOC filings, and documents from another lawsuit involving the Defendant: *Judith Peters v. Boehringer-Ingelheim Pharmaceuticals, Inc.*, Case No. 6:15-cv-694-ORL-18TBS.

On December 29, 2015, the Defendant filed the Motion to Strike, contending that the exhibits attached to the Response have not been authenticated, and cannot otherwise be reduced to an admissible form.  The Defendant further contends that the Plaintiff's cross-motion for summary judgment contained in the Response should be stricken as a back-door attempt to file a summary judgment motion that would otherwise be untimely under the CMSO.  On December 30, 2015, the Plaintiff filed the Motion for Leave. Through the Motion for Leave, the Plaintiff seeks to file a statement of disputed facts and to correct formatting errors in the Response.  The stated basis for the relief sought in the Motion for Leave is Federal Rule of Civil Procedure 15 and paragraph 6(b) of the CMSO.

## B.   Factual Background[2]

### 1.   General Background

The Plaintiff is a thirty-three (33) year old female, (Pl's Dep. Tr. at 12:11-12), and is married with two children, ages seven and five. (Pl's Dep. Tr. at 12:17-24).   The Plaintiff's husband is currently unemployed, having voluntarily left his job at Citibank in July, 2014. (Pl's Dep. Tr. at 34:11-24; 35:18-22).

The Plaintiff was hired by the Defendant as a pharmaceutical sales representative level 1 on November 30, 2007. (Pl's Dep. Tr. at 51:21-25).   As a pharmaceutical sales representative, the Plaintiff was paid a salary of between $57,000.00 and $58,0000.00. (Pl's Dep. Tr. at 15:11-12).   In addition, the Plaintiff was eligible to earn quarterly commission payments. (Pl's Dep. Tr. at 15:19-21).   At her deposition, the Plaintiff testified that she does not have "the best understanding" of her commission structure. (Pl's Dep. Tr. at 15:2-4).

John Steadman became the Plaintiff's district manager in August, 2010, and served in that capacity until November, 2012 (Pl's Dep. Tr. 55:1-12).   Upon becoming the Plaintiff's supervisor, John Steadman promoted the Plaintiff to pharmacy sales representative level 2 in August, 2010. (Pl's Dep. Tr. at 64:2-8).   Kevin Bacon replaced John Steadman as the Plaintiff's district manager in January, 2013, and served in that capacity until February, 2013 (Pl's Dep. Tr. at 55:13-20).   According to the Plaintiff, Kevin

---

[2] The factual background set forth herein should not be deemed an exhaustive summary of the Plaintiff's deposition testimony.  Due to the Plaintiff's failure to file a separate statement of disputed facts, the Court has reviewed the entire record on summary judgment, including the Plaintiff's complete deposition transcript, and summarized some of the more salient excerpts for ease of reference.  The Court's omission of any facts from this section should not be construed to mean the Court did not consider or rely on the entirety of the Plaintiff's deposition transcript in ruling on the Motion for Summary Judgment.

Bacon was terminated for being inappropriate towards other female employees of the Defendant. (Pl's Dep. Tr. at 56:1-4).   After Kevin Bacon's termination, Scott Wyman became the Plaintiff's supervisor in June, 2013. (Pl's Dep. Tr. at 62:3-17).

2.    *The Certified Field Training Program*

After Steadman became the Plaintiff's supervisor, the Plaintiff advised Steadman that she wanted to be considered for the Defendant's certified field training program. (Pl's Dep. Tr. at 68:17-22).   According to the Plaintiff, the certified field trainer program is not a job or a promotion in and of itself. (Pl's Dep. Tr. at 89:1-8).   Rather, had the Plaintiff been accepted into the certified field training program, she still would have been classified as a level 2 sales representative. (Pl's Dep. Tr. at 89:9-11).   However, according to the Plaintiff, employees are required to pass through the certified field training program before becoming eligible to participate in the Defendant's management development process. (Pl's Dep. Tr. at 68:6-9).   The Plaintiff does not know how many people were accepted into the certified field training program each year. (Pl's Dep. Tr. at 70:16-19).

The Plaintiff claims that she and Steadman agreed to put completing (or getting into) the certified field training program on the Plaintiff's development plan for 2011. (Pl's Dep. Tr. at 68:21-24).   According to the Plaintiff, Steadman told her that in order to get into the certified field training program she would have to raise her sales, increase her sales ability and persuasiveness, and learn her products to a higher standard. (Pl's Dep. Tr. at 69:10-12).   The record does not indicate whether the Plaintiff accomplished the goals Steadman set for her to get into the certified field training program.

During her field rides with Steadman, the Plaintiff claims that she consistently reiterated her desire to get into the certified field training program. (Pl's Dep. Tr. at 70:1-4).   In response, the Plaintiff claims Steadman would "kind of push back" and be "non-

committal." (Pl's Dep. Tr. at 70:7-12).   Moreover, during her field rides with Steadman, the Plaintiff claims Steadman criticized her for seeking out a promotion, instead of focusing on spending more time with her young children and family. (Pl's Dep. Tr. at 116:1-8).   The Plaintiff further claims that Steadman asked her to reconsider being a stay at home mother, and suggested that she could be equally fulfilled being on the PTA or on the board of her HOA. (Pl's Dep. Tr. at 116:6-16).   Moreover, the Plaintiff claims Steadman made disparaging comments about African Americans, particularly African American women. (Pl's Dep. Tr. at 117:6-16).

### 3.   Plaintiff's First Human Resources Complaint

The Plaintiff complained to human resources in September, 2011 after Steadman selected another employee, Stephanie Taylor, for admission into the certified field training program. (Pl's Dep. Tr. at 53:7-19).   The Defendant investigated the Plaintiff's complaint, and provided the Plaintiff with the results of the investigation in February, 2012. (Pl's Dep. Tr. at 102:17—103:3).   The investigation determined that Steadman's comments regarding the Plaintiff's gender and familial status were inappropriate and violated the Defendant's code of conduct. (Pl's Dep. Tr. at 123:18-19).   As a result, Steadman was given a final written warning, and required to attend sensitivity training. (Doc. No. 31-8, at 2).

### 4.   Second Language Training

In addition to being denied entry to the certified field training program, the Plaintiff claims that she wanted to develop a second language, but that the Defendant refused to pay for a CD and study materials to learn the language. (Pl's Dep. Tr. at 74:9-14).   In particular, the Plaintiff testified that Scott Wyman denied her the second language materials in retaliation for complaining to human resources and the EEOC about the

Defendant's allegedly discriminatory conduct. (Pl's Dep. Tr. at 82:9-14).  The Plaintiff does not remember the exact date when she requested that the Defendant provide her with the second language materials. (Pl's Dep. Tr. at 75:1-4).    Moreover, the Plaintiff admitted that there was a form employees had to complete to request second language materials, but she never submitted the form. (Pl's Dep. Tr. at 75:14-19).   The Plaintiff claims she did not submit the form because her managers told her she would not be approved for the second language materials because she needed to focus on her job and her family. (Pl's Dep. Tr. at 79:7-15; 81:10-13).

### 5.    The Negative Performance Review

On January 23, 2013, the Defendant issued the Plaintiff a final performance review for the year of 2012.  The final review stated that "Lindsey Sutherland's performance over the past year has not been fully satisfactory and is below that of her peers, Lindsey is rated   Partially   Meets   Expectations.     Lindsey   needs   to   demonstrate   sustained improvement in the following areas of sales ability and persuasiveness." (Doc. No. 31-4 at 13).   The final review contains "Employee Comments" presumably authored by the Plaintiff, which state "This Final Max Plan Review . . . does not reflect my actual work performance for this year . . . According to the Max Plan Review I received in December with John Steadman, I was on track to get a Meets Expectations in all areas . . . I believe these comments and my resulting reduced raise to be a retaliation for the HR complaint that I filed." (Doc. No. 31-4 at 13).  Aside from the Plaintiff's conclusory statement that the negative performance caused her to receive a reduced raise, the record is devoid of any evidence that the performance assessment affected the Plaintiff's compensation.

### 6.    The Alleged Disability

The Plaintiff claims to have begun suffering from a disability as early as January and February, 2012, which she contends got progressively worse over the following months. (Pl's Dep. Tr. at 111:2-10).  Specifically, during or prior to May, 2012, the Plaintiff claims that she informed the Defendant that she "had some medical concerns," but did not provide the Defendant with any specific information regarding her medical condition. (Pl's Dep. Tr. at 112:7-10).  Thereafter, the Plaintiff claims that she was diagnosed with a neuromuscular disease between June, 2012 and late 2012. (Pl's Dep. Tr. at 71:1-5).  After being diagnosed with neuromuscular disease, the Plaintiff's physicians advised her to keep her body cool and to avoid stress and extreme cold. (Pl's Dep. Tr. at 72:10-13).  The Plaintiff does not recall advising the Defendant of any work restrictions recommended by her physicians. (Pl's Dep. Tr. at 72:14-16).

Sometime after June, 2013, the Plaintiff informed the Defendant that she had been diagnosed with a mitochondrial disorder. (Pl's Dep. Tr. at 174:19—175:3).  The Plaintiff claims that Steadman's comments, coupled with the Defendant's failure to prevent further acts of harassment, caused her mitochondrial dysfunction. (Pl's Dep. Tr. at 23:1-9).

As a result of her alleged mitochondrial disorder, the Plaintiff went on short-term disability leave from October 18, 2013 through April 17, 2014. (Pl's Dep. Tr. at 7:22-8:9). While on short-term disability leave, the Plaintiff received 100% of her wages earned while working. (Pl's Dep. Tr. at 21:23—22:8).  The Plaintiff returned to work for between one and three days between December, 2013 and April, 2014, but claims she was unable to continue working. (Pl's Dep. Tr. at 9:1-24).  As a result, the Plaintiff has been on long-term disability ever since. (Pl's Dep. Tr. at 10:25—11:2). While on long-term disability leave, the Plaintiff receives $3,181.00/month in social security disability benefits, as well

as $582/month in additional long-term disability benefits from Aetna. (Pl's Dep. Tr. at 5:23—6:12). Despite not having worked since April, 2014, the Plaintiff, her husband, and her two children are still enrolled in the Defendant's health benefit plan. (Pl's Dep. Tr. at 16:15-17; 16:25—17:14). In addition, the Plaintiff is still being paid commissions, and still uses the company car provided and paid for by the Defendant. (Pl's Dep. Tr. at 17:18—18:9). The Defendant also provides the Defendant with an allowance for her cellular telephone, and the Plaintiff remains vested in the Defendant's 401(k) and pension plans. (Pl's Dep. Tr. at 19:22—20:24). As of the entry of this order, the Plaintiff's employment has not been terminated. (Statement, at ¶ 51).

### 7.   The Plaintiff's Measure of Damages

The Plaintiff claims that her physicians have told her she cannot work, and will probably never be able to work again. (Pl's Dep. Tr. at 86:14-18). The Plaintiff testified that she believes the Defendant "should pay for the fact that they are responsible for . . . costing me my life." (Pl's Dep. Tr. 94:5-7). The Plaintiff contends that the Defendant should have to pay her medical bills as long as necessary, as well as her future wages "because they are the sole reason I won't be able to bring income in again." (Pl's Dep. Tr. at 94:18-21).

## II.   Legal Analysis

### A.   Summary Judgment Standard

"Federal Rule of Civil Procedure 56 requires that summary judgment be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *U.S. Commodity Futures Trading Com'n v. Am. Derivatives Corp.*, 2008 WL 2571691, at *2 (N.D. Ga. June 23,

2008) (internal quotations omitted). "The moving party bears the initial responsibility of informing the court of the bases for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotations omitted). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist." *Id.* "A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law." *Id.* "An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Here, the Defendant has moved for summary judgment on each of the Plaintiff's claims, and in support, has submitted the Plaintiff's deposition testimony and an affidavit executed by a representative of the Defendant. The Defendant contends that the Plaintiff's deposition testimony, coupled with the Defendant's affidavit, show that there are no genuine issues of material fact as to each of the Plaintiff's claims. In short, the Defendant argues that the Plaintiff's testimony reveals that she (i) has not suffered an "adverse employment action" sufficient to prevail on her employment discrimination and retaliation claims; (ii) cannot demonstrate that the Defendant's conduct was sufficiently severe or pervasive to give rise to a claim for hostile work environment; (iii) is not a "qualified individual" such that she can prevail on her ADA claim; (iv) has not suffered a physical impact injury and, as a result, cannot prevail on her claim for negligent infliction of emotional distress, and (iv) has not alleged claims sounding in a tort recognized under

Florida's common law such that she cannot prevail on her claims for negligent hiring, retention, and supervision.

The Defendant has responded by denying or disputing the Plaintiff's legal arguments.   In support of her arguments, the Plaintiff has attached the following documents to the Response: (i) email correspondence between her and the Defendant's human resources' personnel; (ii) a copy of the investigation summary performed by the Defendant in response to the Plaintiff's human resources complaints regarding Steadman; (iii) copies of her performance reviews; (iv) a publication of frequently asked questions relating to the Defendant's arbitration policies, as well as the Defendant's arbitration plan; (v) copies of records relating to the Plaintiff's sales goals and attainment of such goals; (vi) a copy of a document whereby the Plaintiff acknowledged her obligations under the Defendant's non-retaliation policy; (vii) a copy of a document signed by the Plaintiff's physician stating she should be excused from work from June 19, 2012 through August 4, 2012; (viii) a statement of position submitted to the EEOC by Defendant's counsel; and (ix) documents from a lawsuit filed against the Defendant by a woman named Judith Peters.

Notwithstanding the foregoing, the Plaintiff has failed to submit any deposition transcripts, requests for admissions, interrogatory answers, or affidavits in opposition to the Motion for Summary Judgment.   Rather, the Plaintiff has relied entirely on the above referenced documents to oppose the Motion for Summary Judgment.   Importantly, on a motion for summary judgment, the Court "may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).   "To be admissible in support of or in opposition to a motion for summary judgment,

a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56[c][4], and the affiant must be a person through whom the exhibits could be admitted into evidence." *Sauders v. Emory Healthcare, Inc.*, 360 F.App'x 110, 113 (11th Cir. 2010).  Here, the Plaintiff has neither authenticated any of the documents attached to the Response, nor has she converted any of the unsworn statements from her email correspondence into the form of an affidavit.  Moreover, the documents from the case involving Judith Peters are not self-authenticating under Federal Rule of Evidence 902, as they have not been certified. *See* Fed. R. Evid. 902(4).  As a result, the Court may not consider any of the documents attached to the Response for purposes of ruling on the Motion for Summary Judgment.

Having determined that the Plaintiff is not entitled to rely on the materials attached to the Response in opposing summary judgment, the Court must determine whether to grant the Plaintiff's Motion for Leave to file a separate statement of disputed facts and to correct formatting errors contained in the Response.  The only authorities cited in Motion for Leave are Federal Rule of Civil Procedure 15 and paragraph 6(b) of the CMSO.  Rule 15 states that "[a] party may amend its *pleading* once as a matter of course," and that the Court should otherwise "freely give leave to do so when justice so requires." Fed. R. Civ. P. 15(a) (emphasis added).  Importantly, however, motions (and responses to motions) do not constitute pleadings. *See* Fed. R. Civ. P. 7(b); *see also Novak v. Petsforum Grp., Inc.*, 2005 WL 1861778, at *1 (E.D.N.Y. Aug. 1, 2005) (stating that a response to a motion is not a pleading because it is not listed in Rule 7(a)).  As a result, Rule 15(a) does not provide the Court with authority to permit the Plaintiff to amend the Response, or to file a separate statement of disputed facts.

Moreover, even if the Court were inclined to permit the Plaintiff to belatedly submit a separate statement of disputed facts, any such statement would necessarily be deficient, as the Plaintiff has failed to submit any affidavits, deposition testimony, requests for admissions, interrogatory answers, or authenticated documents in support of the factual contentions made in the Response. Thus, the Plaintiff's request for leave to submit a statement of disputed facts fails due to futility. Finally, paragraph 6(b) of the CMSO does not contain any provision enabling the Plaintiff to belatedly amend its Response, and instead clearly states that motions to amend the CMSO "*are disfavored*." In light of the foregoing, the Motion for Leave must be denied.

## B.    Employment Discrimination Claim

Section 760.10(1) of the Florida Statutes states that "It is an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status." Fla. Stat., § 76.10(1)(a). "Since the FCRA essentially mirrors Title VII, Florida courts look to federal case law construing Title VII" when ruling on FRCA claims. *McCabe v. Excel Hospitality, Inc.*, 294 F.Supp.2d 1311, 1313 n.1 (M.D. Fla. 2003).

Under Title VII, an employer may not discriminate "'against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.'" *Vickers v. Fed. Express. Corp.*, 132 F.Supp.2d 1371, 1377 (S.D. Fla. 2000) (quoting 42 U.S.C. § 2000e-2(a)). To prevail on a claim for employment discrimination, the employee must prove that "she suffered an *adverse employment action* as a result of her employer's alleged discrimination." *See, e.g.*, *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) (emphasis

added); *see also Gillis v. Ga. Dept. of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005) ("Courts have uniformly required a plaintiff . . . to establish, as part of her prima facie case, a so-called 'adverse employment action.'"). "[T]o prove adverse employment action . . . an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Anderson v. United Parcel Serv., Inc.*, 248 F.App'x 97, 100 (11th Cir. 2007) (emphasis in original). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Here, the Plaintiff identifies three separate events that she claims constituted adverse employment actions under Title VII. First, the Plaintiff claims that the Defendant refused to provide her the training opportunities offered by the certified field training program. Second, the Plaintiff claims she was denied resources from which to learn a second language. Finally, the Plaintiff claims that her compensation was reduced as a result of a negative performance review.

### 1. The Certified Field Training Program

With respect to the certified field training program, courts have held that "a failure or refusal to train an employee based on that employee's membership in a protected class is an adverse action." *Chaib*, 744 F.3d at 982. However, to make a prima facie case of refusal to train, the plaintiff must create a sufficient evidentiary link between a denial of training and a lack of promotion. *Belgasem v. Water Pik Techs., Inc.*, 457 F.Supp.2d 1205, 1215 (D. Colo. 2006). To do so, the plaintiff should offer evidence pertaining to (i) the specific nature of the training that was denied; (ii) the specific qualifications for the promotions that were denied, and (iii) the other applicants, their qualifications, any

relevant training they may have possessed. *Id.* For instance, in *Bullock v. Windall*, the court granted summary judgment to a defendant because the plaintiff failed to show "that not attending the CESMARS training course would affect his salary, chances of promotion, ability to perform his job, etc." 953 F.Supp. 1473 (M.D. Ala. 1996).

Here, the Plaintiff testified that she asked to be placed into the certified field training program during her first meeting with Steadman, and that she and Steadman included completing or getting into the certified field training program on her development plan for 2011. When the Plaintiff asked to be placed into the certified field training program, she claims Steadman told her "all [she] had to do was raise [her] sales, increase [her] sales ability and persuasiveness and learn [her] products." (Pl's Dep. Tr. at 69:10-12). According to the Plaintiff, Steadman told her that if she accomplished those goals he "said that he would approve me to go to --- or he would put my name in to go to --- to get the --- to go to the training for the certified field trainer." (Pl's Dep. Tr. at 80:19-23).

Aside from the testimony described above, the record is devoid of any evidence that the Plaintiff *actually applied* for and was *denied admission* to the certified field trainer program. In fact, the record contains no evidence regarding the application process, if any, for getting into the certified field training program. Moreover, the Plaintiff has failed to submit any evidence that she accomplished the "three things" Steadman told her to do if she wanted him to "put [her] name in to go . . . to the training." The record is also devoid of any evidence regarding whether Steadman even had the authority to "put [the Plaintiff's] name in to go . . . to the training," and if he did, whether additional levels of approval would have been required in order for the Plaintiff to get into the program. To the extent that additional levels of approval were required, the record is unclear as to who

was responsible for making those decisions, and/or what criteria would be considered in selecting applicants.   Finally, the record does not contain any corroborating evidence regarding the specific nature of the training that would have been provided in the certified field trainer program, and how such training would have impacted the Plaintiff's promotional opportunities.   Taken together, the Plaintiff's contention that she was denied the opportunity to participate in the certified field training program is without evidentiary support and, as a result, is insufficient to create a genuine and material factual dispute regarding whether the Plaintiff suffered an adverse employment action.

### 2.   The Second Language Materials

With respect to the Plaintiff's claim that she was denied access to resources from which to learn a second language, courts have held that an employer's failure to provide training for matters outside the scope of the employee's job responsibilities does not constitute an adverse employment action. *See Miller v. City of Coral Gables*, 2000 WL 33231604, at *7 (S.D. Fla. Oct. 3, 2000) (Defendant's failure or delay in training Plaintiff on the Dictaphone machine does not amount to an adverse employment action, because Plaintiff was not responsible for operating the machine until trained.).   Here, it is difficult to comprehend how the Defendant's refusal to provide the Plaintiff with training in a second language could have adversely affected her employment as a pharmaceutical sales representative.   There is simply no evidence in the record that developing a second language would have improved the Plaintiff's employment opportunities, much less that the denial of such training constituted an adverse employment action.   Moreover, there is no evidence in the record that identifies which language the Plaintiff aspired to learn, or the particular materials the Plaintiff requested to be provided.   Moreover, the Plaintiff's testimony reveals that she failed to complete and submit the authorization form necessary

to have obtained such materials. Finally, the record is also devoid of any evidence that other employees received language-based training, and if so, whether the training sought by the Plaintiff was comparable to training sought by other employees. In light of the foregoing, the Plaintiff's contention that she was denied training in a second language is unsupported by the record, and is otherwise insufficient to create a genuine and material dispute as to whether the Plaintiff suffered an adverse employment action.

### 3. The Negative Performance Evaluation

Finally, the Plaintiff's contention that she suffered an adverse employment action in the form of a "reduced raise" due to a negative performance review lacks evidentiary support. To be clear, the Eleventh Circuit has held that a negative performance evaluation "that *directly disentitles* an employee to a raise of any significance" can indeed constitute an adverse employment action. *Gillis*, 400 F.3d at 888 (emphasis added). However, a plaintiff who receives a negative performance evaluation, but fails establish a connection between the negative review and a loss in benefits, ineligibility for a promotion, or more formal discipline, has not suffered an adverse employment action. *Anderson*, 248 F.App'x at 100.

Here, the only evidence relating to the Plaintiff's alleged decrease in compensation consists of self-serving statements by the Plaintiff that her negative performance evaluation in March, 2013 "affected [her] pay raise." (Pl's Dep. at Ex. 2 p. 16); *see also* (Pl's Dep. at Ex. 4 p. 13) (stating that the Plaintiff believes her "reduced raise" constituted retaliation for filing complaints with human resources). Even taking these statements at face value, the Plaintiff's testimony does not indicate that the negative performance review *directly disentitled* her to receive a significant increase in compensation. Rather, by her own admission, the negative performance review only "affected" her

compensation.  Moreover, there is no corroborating evidence in the record, such as payroll records, internal memoranda, deposition testimony, interrogatory answers, admissions, or other discovery materials that indicates the negative performance evaluation affected the Plaintiff's compensation.  The Plaintiff's failure to provide the Court with such evidence is particularly concerning given her testimony that she does not have "the best understanding" of her commission structure.  Since the Plaintiff lacks personal knowledge regarding her compensation structure, and has failed to provide the Court with evidence from which to corroborate her subjective belief that the negative performance review affected her compensation, the Plaintiff has not connected the dots between the negative performance review and her alleged "reduced raise."

In sum, the Plaintiff has failed to come forward with evidence in support of her claim that the Defendant's allegedly discriminatory conduct resulted in her suffering an adverse employment action.  As a result, the Defendant is entitled to summary judgment on Count I of the Complaint, as it pertains to employment discrimination.

## C.   Retaliation Claim

"Title VII's retaliation provision makes it unlawful to discriminate against any individual because she has opposed any practice made an unlawful practice by the Act." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F.App'x 847, 852 (11th Cir. 2009).  "To establish a prima facie case of retaliation, the plaintiff must show: (1) that he engaged in statutorily protect expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).  As noted above, the Plaintiff has failed to satisfy her burden of producing evidence that she suffered an adverse employment action.  For this reason, the Defendant is also entitled to summary judgment on Count II of the Complaint.

D.    **Hostile Work Environment**

To prove unlawful employment discrimination under Title VII, the employee "may rely on either a 'tangible employment action' theory or a 'hostile work environment' theory." *Hyde v. K.B. Home, Inc.*, 355 F.App'x 266, 271 (11th Cir. 2009).  "A tangible employment action is a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*  This is essentially the same test used to determine the existence of an "adverse employment action" used for gender discrimination and retaliation claims. *Id.*  "A Title VII harassment claim under the 'hostile work environment' theory, [on the other hand], is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* "To prove sexual harassment under a hostile work environment theory, a plaintiff must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there is a basis for employer liability." *Id.* at 271-72.

Here, it is undisputed that the Plaintiff is a member of a protective class.  Moreover, based on the Plaintiff's deposition testimony, she has carried her burden of establishing that she was subjected to unwelcome comments regarding her gender and familial status. As a result, the Plaintiff has provided evidence sufficient to satisfy the first three elements of her prima facie claim for hostile work environment.

With respect to the fourth element, i.e. that the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," the Plaintiff must satisfy both an objective and subjective component. *Id.* at 272.   In particular, "the behavior must result in both an environment that a reasonable person would find hostile or abusive, and an environment that the victim subjectively perceives to be abusive." *Id.*  As for the objective component, courts look at the totality of the circumstances and consider "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

Here, the Plaintiff's deposition testimony is sufficient to overcome the subjective component, as she has testified that she perceived the Defendant's (and in particular, Steadman's) conduct to be abusive.   However, as explained below, the Plaintiff's testimony is insufficient to satisfy the objective component.

1.   *Frequency of the Conduct*

With respect to the first issue, the Plaintiff's testimony reveals that the alleged harassment primarily occurred during field rides with Steadman.   On this point, it is important to note that the field rides occurred approximately once every six weeks. (Pl's Dep. Tr. at 119:16-17).   Compared to hostile work environment cases in which courts have denied summary judgment for the employer, the Defendant's conduct appears to have occurred fairly infrequently and on an isolated basis. *See, e.g.*, *Reyna v. ConAgra Foods, Inc.*, 506 F.Supp.2d 1363, 1373 (M.D. Ga. 2007) (noting that the record contained evidence that the defendant made "racially derogatory comments 'a lot' and on 'a daily basis' . . . for the fifteen to eighteen months [p]laintiff worked under [the supervisor].").

Given that the bulk of the allegedly harassing behavior occurred less than once a month, the Plaintiff has not established that the allegedly harassing conduct occurred so frequently to constitute a hostile work environment.

2.    *Severity of the Conduct*

As to the second issue, the record indicates that the allegedly harassing conduct consisted of comments made by the Plaintiff's supervisors regarding her gender, familial status, propensity to file human resources and EEOC complaints, and suitability for the job of pharmaceutical sales representative.   While this type of conduct is certainly inappropriate for a professional working environment, it falls short of the types of behavior that have been recognized by the United States Supreme Court as being sufficiently severe and humiliating to give rise to a claim for hostile work environment. *See Indest v. Freeman Decorating*, 164 F.3d 258, 264 (5th Cir. 1999) ("All of the sexual hostile environment claims decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment.").

For example, in *Meritor Sav. Bank, FSB v. Vinson*, the Court held that a supervisor's sexual advances towards the plaintiff, which the plaintiff testified resulted in between 40 and 50 unwelcome sexual encounters, as well as several forcible rapes, were sufficient to have created a hostile work environment. 477 U.S. 57, 60. Moreover, unlike in the *Reyna* case, the record does not contain evidence to suggest Defendant's alleged derogatory comments were coupled with discriminatory rules or practices that affected women and other minority groups. *Reyna*, 506 F.Supp.2d at 1373 (stating that the supervisor "not only made racist remarks directly about Hispanics and Hispanic women, but she also imposed hiring 'rules' requiring [p]laintiffs to discriminate directly against

Hispanic women, a group to which [p]laintiffs belonged."). Contrasted with the facts of *Meritor* and *Reyna*, the record evidence does not demonstrate that the Defendant's allegedly harassing conduct was so severe or pervasive to constitute a hostile work environment.

### 3.    Physical Threats and/or Humiliation

With respect to the third issue, the record does not contain any evidence that any of the Defendant's agents physically threatened the Plaintiff.   Instead, the Plaintiff's testimony reveals that all of the allegedly harassing conduct consisted of, at most, verbally insensitive and inappropriate commentary.   As for humiliation, Steadman's alleged comments may well have created an implication that the Plaintiff was not being a good mother by focusing on her career instead of her children.   This, however, does not necessarily mean that Steadman's comments were humiliating.   The word "humiliate" is defined as to "make (someone) feel ashamed and foolish by injuring their dignity and self-respect, especially publically." *See* https://www.google.com/#q=humiliate (last visited March 17, 2016).   While the Defendant's comments may well have offended the Plaintiff and made her feel ashamed or embarrassed, there is no indication that any of Steadman's comments were made publically.   Rather, the statements at issue were all made during private field rides.   Moreover, while Steadman's comments created an inappropriate and derogatory implication that the Plaintiff was not a good mother because she chose to focus on her career, the comments at issue are a far cry from those in *Reyna* where the supervisor made overtly disparaging and derogatory comments towards women and minorities in general. *Reyna*, 506 F.Supp.2d at 1374.   Taken together, the lack of evidence demonstrating physical threats, coupled with the private and indirect nature of

the Defendant's verbal statements, fail to demonstrate that the Defendant's conduct was physically threatening or humiliating.

4. *Unreasonable Interference with Job Responsibilities*

With respect to the fourth issue, the Plaintiff's testimony reveals that the level of acrimony between her and her supervisors may have increased the Plaintiff's level of anxiety and, as a result, made her less effective at performing her job responsibilities. Notwithstanding those issues, there is no record evidence that the Defendant's conduct unreasonably prevented the Plaintiff from performing the essential duties of her employment. This is particularly true given that her primary employment duties were (i) to "call on physicians and get into scientific discussions with physicians in order to persuade them to write [the Defendant's] products," (ii) "to call on pharmacies to . . . develop relationships with them," and (iii) "developing business plans on how we were going to manage the territory and routing, stuff like that." (Pl's Dep. Tr. at 63:4-16). Moreover, the Plaintiff testified that she did not work out of the Defendant's offices; rather she worked out of her home. (Pl's Dep. Tr. at 63:23-64:1). Given that the Plaintiff was primarily responsible for interacting with third-party physicians and pharmacists, and did not work out of the Defendant's offices, it is difficult to comprehend how the Defendant's conduct affected the Plaintiff's ability to perform her day-to-day functions of employment.

Taken together, the Court does not believe the Plaintiff has provided sufficient evidence that the referenced conduct was sufficiently severe or pervasive to constitute a hostile work environment. As a result, the Defendant is entitled to summary judgment on Count I of the Complaint, as it pertains to hostile work environment.

### E.    ADA Claim

"The ADA provides that no covered employer shall discriminate against 'a qualified individual with a disability because of the disability of such individual' in any of the 'terms, conditions, or privileges of employment.'" *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1304 (11th Cir. 2000).  "The ADA places the burden on the employee to establish a prima facie case of disability discrimination." *Id.* at 1305.  "To establish a prima facie case of disability discrimination," the employee "must prove that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Id.*  "A 'qualified individual with a disability' is an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.*  If the employee "is unable to perform an essential function" of his job, "even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Id.*

Here, the Plaintiff's ADA claim fails for two interrelated reasons.  First, the only evidence offered in support of the Plaintiff's claim that she is disabled is her own self-serving testimony that she suffers from a mitochondrial disorder, (Pl's Dep. Tr. at 8:23), and a single form filled out by one of the Plaintiff's physicians stating that she could not work for the period of June 19, 2012 through August 4, 2012. (Doc. No. 34-9).[3]  Strikingly, while the Plaintiff's deposition testimony makes reference to various additional medical records, none of those records are included in the record.  Moreover, the Plaintiff's own testimony reveals that there is, at a minimum, some dispute among her physicians

---

[3] As noted previously, the form attached to the Response has not been authenticated and, as a result, is not admissible for purposes of ruling on the Motion for Summary Judgment.  Nevertheless, even if the Court were to consider the form in opposition to the Motion for Summary Judgment, the result would remain unchanged.

regarding whether she in fact suffers from mitochondrial disease. *See* (Pl's Dep. Tr. at 8:25—9:1-13).  Given the burden of proof of proving up an ADA claim, the Plaintiff should be prepared to substantiate her claim that she is disabled with medical records, physician testimony, and other related evidence.  Having failed to do so, the Court lacks evidence from which to infer that the Plaintiff is disabled under the ADA.

Second, even if the Court were satisfied that the Plaintiff is disabled under the ADA, her testimony indicates that she is incapable of performing the essential functions of her employment, with or without reasonable accommodation.  In fact, the Plaintiff has explicitly testified that she *cannot* perform the essential requirements of her employment, and the record contains documentary evidence corroborating that fact. *See* (Pl's Dep. Tr. at 86:14-18) ("I can't work . . . I will probably never be able to work again."); (Doc. No. 31-7) (stating that the Plaintiff cannot perform any of her job responsibilities "for any sustained period of time.").   Moreover, the Plaintiff's argument that her disability developed over a period of time, and that the Defendant failed to make reasonable accommodations for her during the initial stages of her disability, is pure conjecture.  The Plaintiff admitted during her deposition that she never informed the Defendant that she was suffering from a mitochondrial disorder during her leave of absence in 2012. (Pl's Dep. Tr. at 171:15-22).  Instead, according to her testimony, the Plaintiff first advised the Defendant that she was suffering from a mitochondrial disorder sometime after June, 2013. (Pl's Dep. Tr. at 174:19—175:1-3).  The record further indicates that (i) the Plaintiff was placed on short-term disability leave from October 18, 2013 through April 17, 2014, (ii) she unsuccessfully returned to work for a period of one to three days; and (iii) that she applied for and was approved for long-term disability thereafter. (Statement, at ¶¶ 31-33).

In light of the foregoing, it appears undisputed that the Plaintiff was unable to perform the essential functions of her employment for any sustained period of time following the diagnosis her alleged mitochondrial disorder.

Taken together, the Plaintiff's testimony completely forecloses her from making a prima facie case under the ADA.   If the Plaintiff is to be believed, her mitochondrial disorder has rendered her completely disabled and unable to perform the essential functions of her employment.  If such evidence is sufficient to demonstrate that the Plaintiff is disabled under the ADA, it also forecloses her from proving that she is capable of performing the essential functions of her employment, with or without accommodation. As a result, the Plaintiff cannot establish that she is a qualified individual, and the Defendant is entitled to summary judgment on Count III of the Complaint.

### F.    Negligent Infliction of Emotional Distress

"Generally, in order to recover damages for emotional distress caused by the negligence of another in Florida, the plaintiff must show that the emotional distress flows from physical injuries sustained in an impact." *Elliott v. Elliott*, 58 So.3d 878, 880 (Fla. 1st DCA 2011).  "The underlying basis for the impact rule is that allowing recovery for injuries resulting from purely emotional distress would open the floodgates for fictitious or speculative claims." *Id.* at 881.  While there are exceptions to the impact rule, they are narrow.  "Put another way . . . if the plaintiff has not suffered an impact, the mental distress must be manifested by a discernable physical injury, the plaintiff must have been involved in the incident which involved a closely-related person, and the plaintiff must suffer the physical injury within a short time after the incident." *Id.*  In practice, courts have applied the exception in extreme and rare cases, such as where a "plaintiff's wife was so overcome with shock and grief that she collapsed and died on the spot upon arriving at

the scene of her daughter's death," and where a plaintiff developed medical conditions "after witnessing her father being killed in an apartment bombing." *Id.* at 881-82.

Here, the Plaintiff has not alleged that any of her injuries were sustained as a result of a physical impact.  To the contrary, the Plaintiff has alleged that she suffered a psychological trauma, which has manifested itself as a physical injury.  As a result, it appears that the Plaintiff is attempting to recover under the narrow exception to the impact rule described above.  The Plaintiff is ineligible to proceed under this exception for three reasons.  First, the Plaintiff has not provided the Court with any evidence, aside from her self-serving testimony, that she has suffered a physical injury.  At best, the record contains equivocal evidence that the Plaintiff has been diagnosed with a mitochondrial disorder.  It is not clear, however, whether this condition amounts to a physical injury, as no medical records, physician testimony, or other corroborating evidence regarding the mitochondrial disorder are included in the record.  Second, the Plaintiff has not produced evidence that any physical injuries she sustained were caused by an incident involving a closely-related person.  To the contrary, the alleged injuries, if any, were suffered by the Plaintiff; not by a closely-related person.  Third, the record is equivocal regarding when the Plaintiff's alleged physical injuries manifested themselves in relation to the alleged psychological trauma caused by the Defendant.  In particular, the initial comments made by Steadman regarding the Plaintiff's gender and familial status occurred during 2010 through 2012; however, she did not seek leave from work due to her mitochondrial condition until mid-2013.  As a result, the alleged connection, if any, between Steadman's comments and the onset of the Plaintiff's mitochondrial disorder is extremely tenuous.

Based on the foregoing, the undisputed facts and record evidence demonstrate that the Defendant is entitled to summary judgment on the Plaintiff's negligent infliction of emotional distress claim.  The Plaintiff has not suffered a physical impact injury, nor has she suffered mental distress as a result of physical injuries sustained by a closely-related person.  Consequently, the Defendant is entitled to judgment as a matter of law on Count IV of the Complaint.

### G.    Negligent Hiring, Retention, and Supervision

"Under Florida law, 'negligent supervision and retention occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicates his unfitness and the employer fails to take further action such as investigation, discharge, or reassignment." *Freese v. Wuesthoff Health Sys., Inc.*, 2006 WL 1382111, at * 8 (M.D. Fla. May 19, 2006).  "Liability will thus attach when an employer knew or should have known about the offending employee's unfitness and failed to take the appropriate action." *Id.*  "The 'underlying wrong . . . must be based on an injury resulting from *a tort which is recognized under common law*." *Id.* (emphasis in original).  Importantly, the torts of hostile work environment and employment discrimination "are not common law causes of action" and, as a result, do not support a claim for negligent hiring and/or retention and supervision. *Id.* at *9.

Here, the Plaintiff's negligent hiring, retention, and supervision claims are based on conduct that allegedly constituted employment discrimination and harassment under Title VII, the ADA, and the FRCA.  Aside from the negligent infliction of emotional distress claim, which is subject to dismissal under the impact rule, the Plaintiff has not provided the Court with any evidence of tortious conduct that could form a basis for a claim for

negligent hiring, supervision, or retention.   As a result, the Defendant is entitled to summary judgment on Counts V and VI.

**III.    Conclusion**

Accordingly, it is

**ORDERED** that the Motion for Summary Judgment is **GRANTED.**   The Clerk of Court is directed to enter judgment for the Defendant, and to close this case.

It is further **ORDERED** that the Motion for Leave is **DENIED**, and the Motion to Strike is **DENIED AS MOOT.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 21st day of March, 2016.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

All Parties and Counsel of Record